IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOHN M. TUHEY,

                Plaintiff,

     v.

ILLINOIS TOOL WORKS, INC.,

                Defendant.

Case No. 17 C 3313

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant's Rule 12(b)(6) Motion to Dismiss [ECF No. 8]. For the reasons to follow, the Motion is granted in part and denied in part. Counts IV and VI are dismissed without prejudice. Count VII is dismissed with prejudice.

## I.  BACKGROUND

To redress wrongs allegedly visited upon him by his former employer, Plaintiff John M. Tuhey ("Tuhey") filed this lawsuit under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* (the "ADA"), the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* (the "FMLA"), the Employee Retirement and Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"), and Illinois common law.

The following facts are drawn from Tuhey's First Amended Complaint and are, for purposes of this Motion, accepted as true,

with all reasonable inferences drawn in his favor. *See, e.g., Adams v. City of Indianapolis,* 742 F.3d 720, 728 (7th Cir. 2015).

Illinois Tool Works, Inc. ("ITW") hired Tuhey in 2005 as an associate general counsel. (ECF No. 12 ("FAC") ¶ 7.) Years of bonhomie ensued, and ITW showered Tuhey with "positive reviews and corresponding raises and bonuses" until November 2014, when he was hospitalized after a spate of dizziness, fatigue, nausea, and vomiting with what doctors diagnosed initially as "vestibular neuritis and/or some sort of virus." (*Id.* ¶¶ 8, 9.) ITW designated the time Tuhey spent hospitalized as FMLA leave. (*Id.* ¶ 8.) Immediately following his hospitalization and until December 3, 2014, Tuhey continued to suffer the same symptoms and accordingly worked full-time from home. (*Id.* ¶ 10.) ITW "inappropriately designated this period of time as FMLA leave." (*Id.* ¶ 11.) Tuhey returned to work in early December 2014 on a reduced schedule, continuing to work from home as needed. (*Id.* ¶ 12.)

By January 2015, Tuhey had experienced overall improvement in his condition. So he returned to work on a full-time schedule, spending much of that month traveling. (FAC ¶ 13.) Unhappily, "on or around February 25, 2015, Plaintiff suffered a severe reaction to a newly prescribed medication which forced him to work from home for two weeks." (*Id.* ¶ 15.) ITW again designated this time as FMLA leave despite Tuhey's working full-time. (*Id.* ¶ 16.) When Tuhey

returned to the office after this second illness, ITW's General Counsel, Maria Green, "asked him many probing and intrusive questions about his health," cast aspersions on his memory, and suggested that Tuhey take full-time medical leave. (*Id.* ¶ 17.) Tuhey declined to do so, and he subsequently lodged a complaint with ITW's human resources director that "he believed Ms. Green was discriminating against him because of his medical condition and time off." (*Id.* ¶ 18.) No action was taken, and instead Green informed Tuhey in April 2015 that he was no longer to report to her but instead to a deputy general counsel, Mr. Derek Linde, making "it appear to others as if Plaintiff had been demoted." (*Id.* ¶ 19.)

Meanwhile, Tuhey's symptoms recurred and were accompanied by global swelling, leading his doctors to revise their diagnosis from "some sort of virus" to "a brain injury . . . impacting his central nervous system." (FAC ¶ 20.) On May 8, 2015, one of Tuhey's doctors requested that ITW allow him to work from home intermittently as needed. (*Id.* ¶ 21.) Instead of granting this request, ITW informed Tuhey that he had exhausted his FMLA leave and short-term disability benefits such that he would be terminated and lose his insurance unless he applied for long-term disability. (*Id.* ¶ 22.) At this point, Tuhey charged ITW management with inappropriately debiting his FMLA and short-term disability banks for days when he had been working full-time from home. (*Id.* ¶ 23.)

Throughout the balance of his employment with ITW, Tuhey reprised this grievance, but ITW never resolved the issue. (*Ibid.*) On July 1, 2015, further to evaluating Tuhey's work-from-home accommodation request, ITW sought and was provided with more information from his doctor about Tuhey's condition. (*Id.* ¶¶ 24-25.) Nevertheless, ITW persisted in not granting the accommodation. (*Id.* ¶¶ 25-26.)

In October 2015, Linde sent Tuhey an email review criticizing his performance that was replete with "false statements of fact about Plaintiff's performance including falsely accusing Plaintiff of refusing to provide legal advice to the business leaders." (FAC ¶ 27.) Linde "communicated the allegations in this email to others in the law department including Maria Green." (*Ibid.*) A few months later in February 2016, Tuhey was up for an annual performance review, and this report too contained "a myriad of new, alleged false performance accusations which rated him as failing to meet expectations." (*Id.* ¶ 28.) The October 2015 and February 2016 reviews constituted Tuhey's first negative performance reviews in his 10 years at ITW. (*Id.* ¶¶ 27-28.) Tuhey made known his belief that his February 2016 annual review "was related to his disability and request for accommodation." (*Id.* ¶ 28.) The next day, Linde and an individual from ITW's human resources division informed Tuhey "that there was no longer a job for him at Defendant and that he was not eligible to be placed on a Performance Improvement Plan since he

was 'too senior' an attorney and would be unable to change to meet their needs." (*Ibid.*) Effective February 15, 2016, Tuhey was terminated. (*Ibid.*) His departing employee documentation stated that eligibility for benefits ends upon termination, and no one informed Tuhey that he had a right to convert his long-term disability plan to an individual plan – something he learned too late to effect a conversion. (*Id.* ¶ 29.) Tuhey now knows that his symptoms are the result of "a degenerative neurological condition." (*Id.* ¶ 30.)

On April 19, 2016, Tuhey filed EEOC charges challenging ITW's conduct. He received his right-to-sue letter on May 23, 2017 and then filed the Amended Complaint now subject to ITW's Rule 12(b)(6) Motion to Dismiss.

## II. <u>LEGAL STANDARD</u>

To survive a Rule 12(b)(6) motion to dismiss, a complaint "must state a claim that is plausible on its face." *Adams,* 742 F.3d at 728 (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). A claim enjoys "facial plausibility when the plaintiff pleads sufficient factual content that allows the court to draw the reasonable inference that the defendant is liable for the alleged misconduct." *Adams,* 742 F.3d at 728 (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). A plaintiff need not plead the elements of a prima facie case *in haec verba* to survive a motion to dismiss. *See,*

*Twombly,* 550 U.S. at 569 ("[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."). To the contrary, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678. Simply put, a complaint passes Rule 12 muster so long as it invokes a recognized legal theory and contains plausible allegations on the material issues. *See, Richards v. Mitcheff,* 696 F.3d 635, 638 (7th Cir. 2012).

### III.  <u>ANALYSIS</u>

Tuhey brings claims for intentional discrimination, failure to accommodate, and retaliation under the ADA; interference and retaliation under the FMLA; defamation under Illinois law based on the allegedly false statements surrounding his negative performance reviews; and breach of fiduciary duty under ERISA for ITW's failure to inform him of the right to convert his disability policy. Based on a mélange of arguments, ITW has moved to dismiss the non-ADA counts, contending that Tuhey fails to state a claim on which relief can be granted.

### A.  Count IV:  FMLA Interference

The FMLA entitles an employee "afflicted with a 'serious health condition' which renders her unable to perform her job" to twelve weeks of leave per twelve-month period. *Smith v. Hope Sch.,* 560

F.3d 694, 699 (7th Cir. 2009) (quoting 29 U.S.C. § 2612(a)(1)(D)). An employer who interferes with, restrains, or denies an employee's exercise of or attempt to exercise any right provided under the FMLA violates the Act. *See,* 29 U.S.C. § 2615(a)(1); *see also, Preddie v. Bartholomew Consol. Sch. Corp.,* 799 F.3d 806, 816 (7th Cir. 2015). A plaintiff need only show that his employer deprived him of an FMLA entitlement; no finding of ill intent is ultimately required. *See, Burnett v. LFW Inc.,* 472 F.3d 471, 477 (7th Cir. 2006); *accord, Goelzer v. Sheboygan Cnty., Wis.,* 604 F.3d 987, 995 (7th Cir. 2010).

In a lawsuit alleging violation of the FMLA, the statute authorizes recovery of compensatory damages equal to the amount of wages, salary, employment benefits, or other compensation the employee was denied or lost, along with interest. 29 U.S.C. § 2617(a)(1)(A)(i). It also provides for equitable remedies, such as "employment, reinstatement, and promotion." 29 U.S.C. § 2617(a)(1)(B). The remedies available under the FMLA do not include emotional distress, consequential, punitive, or nominal damages. *See, e.g., Nero v. Indus. Molding Corp.,* 167 F.3d 921, 930 (5th Cir. 1999) (finding consequential damages unrecoverable under the FMLA); *Walker v. United Parcel Serv., Inc.,* 240 F.3d 1268, 1278 (10th Cir. 2001) ("Because nominal damages are not included in the FMLA's list of recoverable damages, nor can any of the listed damages be reasonably construed to include nominal damages, Congress

must not have intended nominal damages to be recoverable under the FMLA."); *Breneisen v. Motorola, Inc.,* No. 02 C 50509, 2009 WL 1759575, at *7 (N.D. Ill. June 22, 2009) ("Numerous courts have found that Congress intended the specific remedies set forth in § 2617 to be the exclusive remedies available for a violation of the FMLA.") (internal quotation marks and quotation omitted) (collecting cases); *Lloyd v. Wyoming Valley Health Care Sys., Inc.,* 994 F.Supp. 288, 291-92 (M.D. Pa. 1998) (finding emotional distress damages unavailable under the FMLA).

To prevail on his FMLA-interference theory, Tuhey must ultimately prove that: (1) he was eligible for the FMLA's protections; (2) ITW was covered by the FMLA; (3) he was entitled to take leave under the FMLA; (4) he provided sufficient notice of his intent to take leave; and (5) ITW denied him FMLA benefits. *See,* 29 U.S.C. § 2615(a)(1); *Pagel v. TIN, Inc.,* 695 F.3d 622, 627 (7th Cir. 2012). ITW does not contest that Tuhey levies plausible allegations with respect to these elements, but instead contends that Tuhey is ineligible for any recovery because he has not claimed any actual damages or prejudice to him by virtue of its alleged FMLA interference. The gravamen of Tuhey's claim seems to be inappropriate deduction "from his FMLA bank," leading to ITW's refusal in May 2015 "to provide him protected leave beyond that" and Tuhey's "suffer[ing] loss of FMLA leave." (FAC ¶¶ 49-50.) As a

result, Tuhey requests "a finding that Defendant interfered with his FMLA rights" and an award of "any and all damages available under the statute." (FAC ¶ 52.) Tuhey does not seek equitable relief.

While true that "section 2617 provides no relief unless the plaintiff can prove that he was prejudiced by the violation," *Franzen v. Ellis Corp.*, 543 F.3d 420, 426 (7th Cir. 2008) (citing *Ragsdale v. Wolverine World Wide Inc.*, 535 U.S. 81, 89 (2002)), section 2617 contemplates cases where "wages, salary, employment benefits, or other compensation have not been denied or lost to the employee." 29 U.S.C. § 2617(a)(1)(A)(i)(II). Still, "actual monetary losses" must have been sustained "as a direct result of the violation, such as the cost of providing care." *Ibid.* Tuhey admits that he "did not plead monetary damages" but argues that the mere unjustified reduction in the amount of FMLA days itself is an actionable FMLA interference. (ECF No. 14 ("Pl.'s Br.") at 5.) What impedes plausibility here is Tuhey's failure – but one capable of being remedied – to state how ITW's alleged FMLA interference caused him any actual monetary loss.

Reading the Complaint leaves one with the impression that Tuhey is either complaining that ITW's charging his FMLA banks when he was working from home undercompensated him (but without professing receipt of less salary or fewer other benefits) or that he should have been able to take further FMLA leave in 2015 (in which case any

monetary loss most directly depends on whether ITW's FMLA leave policy was paid or unpaid). (The uncertainty here is partly a function of the fact that the FMLA does not require paid leave. *See,* 29 U.S.C. § 2612(c); *see also, Lee v. City of Elkart, Ind.,* 602 Fed.Appx. 335, 337 (7th Cir. 2015).) To be sure, additional unpaid FMLA leave could conceivably have allowed Tuhey the repose necessary for his medical ailments to improve in some way capable of pecuniary measure – although at the expense of compensation he presumably received while not on leave. But without alleging how, for example, ITW's interference with his FMLA leave engendered some monetary loss *vis-à-vis* his medical needs, Tuhey cannot base his action for FMLA interference on the allegations currently pled. *See, e.g., Cianci v. Pettibone Corp.,* 152 F.3d 723, 728-29 (7th Cir. 1998) (granting summary judgment to employer because plaintiff "did not suffer any diminution of income, and, on the record before us, incurred no costs as a result of the alleged violation," nor did she request equitable relief). In the same vein, any inference that such alleged interference caused Tuhey actual damages in the form of lost income attributable to his termination – because, for example, having to work through the pain degraded his job performance - is incompatible with Tuhey's insistence that he continued doing an exemplary job (and with his suing for defamation based on negative performance reviews).

For these reasons, the Court grants ITW's Motion to Dismiss in relevant part. However, the dismissal is without prejudice to Tuhey re-pleading the issue of damages.

**B. Count V: FMLA Retaliation**

In addition to the interference prohibitions, the FMLA also proscribes retaliation against an employee who exercises or attempts to exercise FMLA rights. *See,* 29 U.S.C. § 2615(a)(2); *see also, Pagel,* 695 F.3d at 631. Retaliation in this context means counting "an employee's use of FMLA leave as a negative factor in promotion, termination, and other employment decisions." *Ibid.* (citing *Breneisen v. Motorola, Inc.,* 512 F.3d 972, 978 (7th Cir. 2008)). "The difference between a retaliation and interference theory is that the first requires proof of discriminatory or retaliatory intent while an interference theory requires only proof that the employer denied the employee his or her entitlements under the Act." *Goelzer,* 604 F.3d at 995 (internal brackets, quotation, and quotation marks omitted).

A plaintiff suing on an FMLA retaliation theory who, like Tuhey, does not allege similarly situated comparators must ultimately show that: (1) he engaged in protected activity; (2) his employer took an adverse employment action against him; and (3) there is a causal connection between the two. *See, Malin v. Hospira, Inc.,* 762 F.3d 552, 562 (7th Cir. 2014); *Pagel,* 695 F.3d at

- 11 -

631. (Negative performance evaluations may constitute adverse employment actions. *Silverman v. Bd. of Educ. of Chicago,* 637 F.3d 729, 741 (7th Cir. 2011).) Typically, to show the causal nexus between protected activity and adverse employment action, a plaintiff points to a direct admission from the employer or circumstantial evidence of retaliatory intent – including suspicious timing and ambiguous oral or written statements. *See, Carter v. Chicago State Univ.,* 778 F.3d 651, 657 (7th Cir. 2015) (noting also that such circumstantial evidence "may be combined to support an inference of discriminatory intent").

ITW does not dispute that Tuhey adequately alleges protected activity and adverse employment actions against him. Instead, ITW argues that the Court can draw no causation inference from the temporal chasm yawning between Tuhey's engaging in protected activity and suffering an adverse employment action. But ITW's argument hinges on the straw man that Tuhey's only FLSA-protected activity occurred in May 2015, when he first complained to ITW "that it had violated the FMLA by inappropriately charging his FMLA and short-term disability banks for the days/times he was working from home." (FAC ¶ 23.) Tuhey goes on to allege, however, that "[f]rom then *until the time of his termination*" the parties went "back and forth as to the amount of FMLA time that he should be charged." (*Ibid.* (emphasis added); *see also, id.* ¶ 54 ("Plaintiff engaged in

protected conduct when he complained about the miscalculation of his FMLA leave and violations of the statute.").) His claims further sustain the inference that, in addition to termination, the negative performance reviews he received in October 2015 and February 2016 were adverse employment actions. (*See, id.* ¶ 55 ("Defendant intentionally retaliated against Plaintiff by issuing him a false and defamatory performance review and terminating him.").)

Taking as true the allegations in Tuhey's Complaint – which the Court must do at this stage – leads to the conclusion that he engaged in FLSA-protected activity sufficiently close to when he was reviewed unfavorably in October 2015 and then in February 2016, a review shortly followed by his termination, to support a reasonable inference of causation. This renders the case materially different from *Johnson v. Cent. States Funds,* No. 13 C 5717, 2014 WL 3810641 (N.D. Ill. July 31, 2014), and the summary judgment case of *Chatman v. Morgan Lewis & Bockius LLP,* No. 10 C 4679, 2015 WL 1744120 (N.D. Ill. Apr. 14, 2015), in which four and eight months, respectively, between protected activity and termination failed on causation grounds to establish FMLA retaliation. *See, Johnson,* 2014 WL 3810641, at *3; *Chatman*, 2015 WL 1744120, at *11.

Further, even if Tuhey's repeated FMLA complaints cannot independently support timing-based causation because ITW was already on notice as of May 2015 of his protected activity, "intervening

events may demonstrate plausible retaliatory animus" so as to bolster a causation inference. *Bowman v. Balt. City Bd. of Sch. Comm'rs,* 173 F.Supp.3d 242, 249-50 (D. Md. 2016) (observing that, although three months passed between direct complaint and complained-of adverse employment action, other events in the interim could be seen as retaliatory so as to support causation); *accord, Lettieri v. Equant Inc.,* 478 F.3d 640, 650 (4th Cir. 2007); *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 281 (3d Cir. 2000). In Tuhey's case, on July 1, 2015, instead of granting his requested work-from-home disability accommodation – something factually intertwined with his complaints about FMLA designation of his previous days working from home – ITW sought more information from Tuhey's doctor. (FAC ¶ 24.) After Tuhey's doctor "promptly responded with information supporting the request for accommodation," ITW nevertheless "still refused to grant" it. (*Id.* ¶ 25.) Thus, by alleging these plausibly retaliatory events preceding at least his October 2015 performance review, Tuhey survives ITW's attempt to dismiss Count V even if his May 2015 FMLA complaint is the only instance of protected activity relevant for causation purposes.

The cases ITW cites for the proposition that suspicious timing alone does not support retaliation liability were decided on summary judgment, not at the motion-to-dismiss stage. *See, e.g., Burks v.*

*Wis. DOT,* 464 F.3d 744, 758-59 (7th Cir. 2006) (appeal from summary judgment) (noting that the plaintiff had not met her burden of proof because "suspicious timing alone . . . does not support a reasonable inference of retaliation"); *Stone v. City of Indianapolis Pub. Utils. Div.,* 281 F.3d 640, 644 (7th Cir. 2002) (appeal from summary judgment) ("[M]ere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue."). Before having the benefit of discovery, retaliation plaintiffs often can suffuse their claims with nothing more than allegations of suspicious timing. That does not render them implausible. *See, e.g., American Civ. Lib. Union of Illinois v. City of Chicago,* No. 75 C 3295, 2011 WL 4498959, at *3 (N.D. Ill. Sept. 23, 2011) ("[T]he fact that the Seventh Circuit held that it is not reasonable to infer retaliation when the evidence the plaintiff has proffered suggests nothing more than suspicious timing, despite ample time for discovery, does not mean that a plaintiff who fails to allege anything more than suspicious timing will not be able to survive a motion to dismiss. Accordingly, it is no surprise that the City fails to point to, and this court is not aware of, any cases in which a court relied upon this *Burks* holding when analyzing a motion to dismiss.")

The Court therefore denies ITW's Motion to Dismiss as to Count V.

## C.  Count VI: Defamation

To state a claim for defamation, a plaintiff must allege (1) that the defendant made a false statement concerning him and (2) that there was an unprivileged publication to a third party with fault by the defendant, (3) which caused damage to the plaintiff. *Kransinski v. United Parcel Serv., Inc.,* 530 N.E.2d 468, 471 (Ill. 1988).  However, certain defamatory statements are actionable *per se* – that is, without allegations or proof of actual damage - because of their presumed materially harmful effect on the plaintiff's reputation.  Among these are statements "imputing an inability to perform or want of integrity of duties of office or employment" and those "that prejudice a party, or impute lack of ability, in his or her trade, profession or business." *Van Horne v. Muller,* 705 N.E.2d 898, 903 (Ill. 1999).  Tuhey claims defamation of this variety, rendering allegations of actual damages inessential here.

ITW first contends that Tuhey's defamation claim is time-barred as it relates to statements allegedly made and published incident to Tuhey's October 2015 performance review.  In Illinois, "[a]ctions for slander [and] libel . . . shall be commenced within one year after the cause of action accrued." 735 Ill. Comp. Stat. 5/13-201. Indeed, Tuhey concedes that any statements arising out of his first

performance review are barred by the statute of limitations. He seeks instead to recover for alleged falsehoods surrounding his February 2016 annual review. (Tuhey and ITW apparently entered into a tolling agreement beginning January 30, 2017, such that "to the extent Tuhey's defamation claim is based on alleged events after January 30, 2016, it is not time-barred." (ECF No. 9 ("Def.'s Mem.") at 8 n.3.))

However, to the extent Count VI is timely, it fails to state a defamation claim for the simple reason that Tuhey does not allege publication of the allegedly "false performance accusations" attending his February 11, 2016 review to anyone other than himself. (*Compare,* FAC ¶ 27 ("Mr. Linde communicated the [October 2015] allegations in this email to others in the law department including Maria Green."); *with, id.* ¶ 28 ("Mr. Linde gave Plaintiff his [February 2016] annual performance review. . . . Plaintiff responded by saying he believed the negative review was related to his disability and request for accommodation.").) Although Tuhey alleges the involvement of one other person in his termination – an individual from ITW's human resources department – nowhere does he allege that Linde's false accusations in his performance review were published to her. Therefore, Tuhey fails to allege facts supporting publication to a third party – the *sine qua non* of defamation liability.

- 17 -

As such, the Court dismisses Count VI but does so without prejudice, as Tuhey may be able to aver plausible publication to others of the allegedly false statements surrounding his February 2016 performance review.

### D.  Count VII: Breach of Fiduciary Duty under ERISA

ERISA statutorily obligates a fiduciary to discharge duties with respect to a plan "solely in the interests of the participants and beneficiaries" with the care, skill, prudence, and diligence a prudent person would use and in accordance with documents and instruments governing the plan. *See,* 29 U.S.C. § 1104(a). "This duty also implicates '[c]onveying information about the likely future of plan benefits, thereby permitting beneficiaries to make an informed choice about continued participation.'" *Herman v. Cent. States, Se. and Sw. Areas Pension Fund,* 423 F.3d 684, 695 (7th Cir. 2005) (quoting *Varity Corp. v. Howe,* 516 U.S. 489, 502 (1996)). To state a claim for breach of fiduciary duty under ERISA, the plaintiff must establish: (1) that the defendant is a plan fiduciary; (2) that the defendant breached its fiduciary duty; and (3) that the breach caused harm to the plaintiff. *See, e.g., Kamler v. H/N Telecomm. Serv., Inc.,* 305 F.3d 672, 681 (7th Cir. 2002).

Tuhey's claim for breach of fiduciary duty is based on the alleged failure of ITW upon his termination to "inform Plaintiff of his right to convert the long-term disability plan to an individual

plan." (FAC ¶ 29.) When Tuhey learned more than a year later that he could have converted benefits vested under ITW's long-term disability policy, it was too late for him to glean any residual benefits. (*Ibid.*) Although Tuhey avers that ITW provided him "information to the contrary" about his right to convert (*id.* ¶ 65), the only meat on these bones is his allegation that ITW provided "documentation regarding his employee benefits" stating that his "eligibility for disability benefits would end on the date of his termination." (*Id.* ¶ 29.) Tuhey does not claim that the documentation he received failed to meet ERISA's strictures or that plan documents required ITW affirmatively to notify him upon termination of his right to convert.

Tuhey's claim founders on the issue of ITW's fiduciary duty to provide the information at issue. Because Tuhey's right to convert arose from his idiosyncratic circumstances – namely, termination coupled with ongoing health issues that could qualify him for long-term disability – the danger of overburdening the fiduciary recognized by the Seventh Circuit precludes recovery for the alleged lack of disclosure here. *See, e.g., Cummings by Techmeier v. Briggs & Stratton Ret. Plan,* 797 F.2d 383, 387 (7th Cir. 1986) (holding that fiduciaries are not required to provide individualized attention to participants, as where an employee failed to elect survivorship option due to mental confusion); *cf., Bowerman v. Wal-*

*Mart Stores, Inc.,* 226 F.3d 574, 590 (7th Cir. 2000) ("In this case, the information the Plan should have provided . . . would not have been information unique to her situation; rather, the information she needed would have been information relevant to all Plan participants who were rehired by Wal-Mart within a few weeks or months after leaving the company."); *Lucas v. Steel King Indus., Inc.,* 32 F.Supp.3d 994, 1003-1006 (W.D. Wis. 2014) (finding critical fiduciary disclosure missing where employer did not inform employees of its replacing former life insurance arrangement with new insurance carrier, because the "right to convert in this case did not arise from [the plaintiff's] individual circumstances" or "his illness" but from "an event that presumably would have triggered conversion rights for all employees").

The Court was not provided nor could it unearth cases expressly treating ERISA fiduciary duty obligations with respect to long-term disability policy conversion. Yet many decisions treat employer-sponsored group life insurance and long-term disability benefits as "employee welfare benefit plans" largely equivalent within the meaning of ERISA. *See, e.g., Demars v. CIGNA Corp.,* 173 F.3d 443, 444-445 (1st Cir. 1999) (discussing ERISA preemption where former employee converted employee welfare benefit plan into private long-term disability insurance policy after termination of employment); *Howard v. Gleason Corp.,* 901 F.2d 1154, 1157 (2d Cir. 1990) ("Mr.

Howard obtained these rights pursuant to the Alliance Group Life and Long Term Disability Insurance Plan, an employee welfare benefit plan within the meaning of [29 U.S.C.] § 1002(1).").  As such, the more robust case law on ERISA fiduciary duties in the context of group life insurance conversion should apply with equal force here. Courts adjudicating apposite claims in that context consistently find no fiduciary duty to provide specific information about conversion rights. *See, e.g., Walker v. Fed. Express Corp.,* 492 Fed.Appx. 559, 561-62, 565-66 (6th Cir. 2012) (finding, where termination "triggered [the decedent's] right to convert his FedEx group life insurance coverage to an individual life insurance policy," that no language in ERISA required Fed Ex to notify decedent or his family of conversion rights); *Prouty v. Hartford Life & Acc. Ins. Co.,* 997 F.Supp.2d 85, 86-87, 90-91 (D. Mass. 2014) (stating that there is no ERISA obligation to provide plan participants with post-termination notice of insurance conversion rights); *see also, Maxa v. Alden Life Ins. Co.,* 972 F.2d 980, 986 (8th Cir. 1992) ("[T]his Court does not construe ERISA or the regulations under it to require that the appellee had a duty individually to warn, upon their sixty-fifth birthdays, each and all of the members of the plans which it insured that their benefits would be reduced according to the plan's coordination of benefits provision unless they enrolled in Medicare.").

- 21 -

Cases holding otherwise typically "involve ERISA fiduciaries who either failed to disclose material information which they knew the beneficiary did not have or affirmatively misinformed the plan participant or beneficiary concerning plan benefits (and did not subsequently provide correct information)." *Neuma, Inc. v. E.I. DuPont de Nemours and Co.,* 133 F.Supp.2d 1082, 1090 (N.D. Ill. 2001) (collecting cases); *see, e.g., Kuntz v. Reese,* 760 F.2d 926, 929, 935 (9th Cir. 1985) (characterizing as sufficient for breach of ERISA fiduciary duty allegations that defendants "misrepresented to each Kuntz plaintiff, both at the time he interviewed for his job and afterward, that the Companies would immediately enroll each Kuntz plaintiff in the pension plan" and that the plan was "'standard' and 'good'" when in fact it "discriminated in favor of the highest-paid workers and failed to provide any coverage to other workers"), *vacated on other grounds,* 785 F.2d 1410 (9th Cir. 1986); *Noel v. Laclede Gas Co.,* 612 F.Supp.2d 1061, 1066-67 (E.D. Mo. 2009) (finding plausible allegations that "Laclede promised or misrepresented to [decedent] that he would have a life insurance conversion right following termination [when he did not have such right], and subsequently provided him misleading information about such right"). In this case, the impugned ITW documentation stating that eligibility for benefits ends upon termination is (at least) as consistent with the need for Tuhey to convert to an individual plan

- 22 -

as it is with the kind of affirmative misrepresentations that permeate such cases. *Twombly* and *Iqbal* thus render implausible Tuhey's allegation that ITW had a fiduciary duty to provide him with the conversion notices he alleges were lacking or otherwise blurred by the "eligibility" language in his termination documentation.

In the alternative, the Court finds wanting allegations that plausibly suggest ITW's intent to disadvantage Tuhey – as opposed to its mere negligent failure to apprise him clearly of the contours of his conversion rights. Mere negligence does not rise to the level of breach of fiduciary duty; instead, an employer "must have set out to disadvantage or deceive its employees." *Vallone v. CAN Fin. Corp.,* 375 F.3d 623, 642 (7th Cir. 2004) ("[W]hile there is a duty to provide accurate information under ERISA, negligence in fulfilling that duty is not actionable.") (citation omitted). The Seventh Circuit "does not recognize merely negligent misrepresentations as a violation of ERISA." *Lingis v. Motorola, Inc.,* 649 F.Supp.2d 861, 874 (N.D. Ill. 2009). But that is all Tuhey's allegations limn, as he has not asserted anything other than a defective disclosure. *See, e.g., Baker v. Knigley,* 387 F.3d 649, 661-62 (7th Cir. 2004) (noting that "vague allegations . . . in the absence of specific allegations of intent to deceive, are not sufficient to state a claim for breach of fiduciary duty under ERISA"). Therefore, even if Tuhey plausibly stated the *existence* of ITW's fiduciary duty to

inform him of his conversion right upon termination, his allegation of *breach* flunks the *Twombly/Iqbal* standard because it is just as consistent with negligence as with ERISA liability. *See, e.g., In re General Growth Props., Inc.,* No. 08 C 6680, 2010 WL 1840245, at *8, 11 (N.D. Ill. May 6, 2010) (granting motion to dismiss breach of ERISA fiduciary duty claim where no allegations supported inference that employer "set out to disadvantage or deceive its employees").

A final malaise infects Tuhey's ERISA fiduciary duty claim – failure to exhaust. District courts may properly require exhaustion of administrative remedies prior to filing of a claim involving alleged violation of an ERISA statutory provision. *See, Powell v. A.T. & T. Comms., Inc.,* 938 F.2d 823, 825-26 (7th Cir. 1991). Congress intended plan fiduciaries, not federal courts, to have primary responsibility for claims processing. *Kross v. Western Elec. Co., Inc.,* 701 F.2d 1238, 1244 (7th Cir. 1983). Although exhaustion is an affirmative defense, a plaintiff can plead himself out of court where, for example, he "admits that he did not exhaust his administrative remedies and pursue further administrative appeals of the partial denial of his claim." *Zhou v. Guardian Life Ins. Co. of Am.,* 295 F.3d 677, 680 (7th Cir. 2002). Such is the case here: Tuhey admits in his brief opposing ITW's Motion that "for th[e] reason" that "[t]he Plan did nothing wrong," "there were no administrative remedies for Plaintiff to exhaust." (Pl.'s Br. at

10.)  That Tuhey was allegedly unaware of his right to convert until it was too late did not prevent him from filing for administrative review on the same basis that underlies Count VII – namely, that excusable ignorance entitled him to an exception to the normal conversion deadline.  Tuhey's cursory protestations to the contrary resemble those, rejected in *Powell*, that "exhaustion of administrative procedures would have been futile" because "[o]nce [the plaintiff] was fired . . . he could not file a request for benefits because the Benefit Committee had no authority to reinstate Powell or award benefits."  *Powell,* 938 F.2d at 826.  On its own – and absent allegations that, upon learning of his conversion rights, he took some step directed to the policy's administrators – Tuhey's sense of hopelessness is insufficient to avoid application of the exhaustion doctrine. *Cf., Honeysett v. Allstate Ins. Co.,* 570 F.Supp.2d 994, 1004-05 (N.D. Ill. 2008) (reserving exhaustion for summary judgment because it was unclear whether plaintiff exhausted administrative remedies where "the plaintiffs' complaint includes an allegation that plaintiff Kunz wrote a letter on February 4, 2005 inquiring about submitting his actual earnings after the deadline for doing so had passed," to which "[t]he Committee replied" but "did not suggest that an appeal from its decision was possible") (internal citation omitted).

For all these reasons, the Court grants ITW's Motion to Dismiss Count VII.  The dismissal is with prejudice.

### IV.  <u>CONCLUSION</u>

For the reasons stated herein, Defendant's Motion to Dismiss [ECF No. 8] is granted in part and denied in part.  Counts IV and VI are dismissed without prejudice.  Count VII is dismissed with prejudice.

**IT IS SO ORDERED.**

_____

Harry D. Leinenweber, Judge
United States District Court

Dated: August 2, 2017